Judgment rendered February 26, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,072-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

QUINESSIAH T. SANDERS                        Appellant

* * * * *

Appealed from the
Sixth Judicial District Court for the
Parish of Madison, Louisiana
Trial Court No. 213,880

Honorable Angela Lynn Claxton, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Doulgas Lee Harville

JAMES EDWARD PAXTON                  Counsel for Appellee
District Attorney

KENNETH ANDERSON BRISTER
ANITA TENNANT MACK
EDWIN MOBERLEY
Assistant District Attorneys

* * * * *

Before COX, THOMPSON, and HUNTER, JJ.

**COX, J.**

This criminal appeal arises from the Sixth Judicial District Court, Madison Parish, Louisiana, the Honorable Angela L. Claxton presiding. The trial court found Quinessiah T. Sanders guilty of second degree murder and sentenced her to life imprisonment at hard labor. For the following reasons, we affirm Sanders' conviction and sentence.

## FACTS

Sanders was indicted by Bill of Indictment in East Carroll Parish for the following:

1) second degree murder of Cheryl L. Lewis ("Cheryl");

2) attempted second degree murder of Tasha Lashay Lewis ("Tasha"); and

3) attempted second degree murder of Samuel Lee Phillips.

The State dismissed count three, attempted second degree murder of Samuel Lee Phillips. The case was relocated to Madison Parish after a jury was not impaneled, resulting in a mistrial. On the morning the jury was to be selected in Madison Parish, the State agreed to sever the remaining two charges, and Sanders motioned for a bench trial on count one, the second degree murder of Cheryl. The following evidence was adduced on April 25, 2023:

Louisiana State Tropper Kaleb Reeves testified that he was dispatched to investigate a shooting on March 23, 2019. Trooper Reeves testified regarding the evidence collected at the scene of the crime. He stated that based on the evidence collected and speaking with witnesses, they made the decision to arrest Sanders for the murder of Cheryl.

Lieutenant Melvin D. Gibson, East Carroll Parish Sheriff's Office, was dispatched on March 23, 2019, to Uncle Darrell's Convenience Store ("Uncle Darrell's") and the Blackberry Lounge ("the Blackberry"). He stated that when he arrived, he found Cheryl on the ground in the parking lot of the Blackberry, and she was not responsive.

Deputy Mark Taylor of the Lincoln Parish Sheriff's Department testified that at the time of the shooting, he was an investigator with the Louisiana State Police. Deputy Taylor stated that he was dispatched to investigate the homicide and photographed the scene upon arrival. Sixty-eight crime-scene photos were introduced into evidence.

Netika Newman testified that she was acquainted with both Cheryl and Sanders and was present during the shooting. She testified as to what she saw and heard the night of the shooting. Ms. Newman was talking with Cheryl's sister, Tasha, when they heard Sanders and her sister, Roshonda Sanders ("Roshonda"), arguing with Bryant Wingate ("Wingate"), Tasha's boyfriend. Wingate was upset that something was "wasted" on his shirt; one of the Sanders sisters apologized, but Wingate continued to yell. Sanders' brother, Roosevelt Sanders ("Roosevelt"), asked Wingate to stop yelling out his sister's name, but Wingate did not stop, and a fight broke out between the Sanders family and Wingate. Tasha walked over to the fight, became involved in the altercation, and sprayed everyone with mace. The altercation eventually ended after other people stepped in to stop it.

Ms. Newman stated that after she drove some people home who were sprayed with mace, Tasha approached her looking for the Sanders and Roshonda. Sanders and Roshonda pulled up in a car, and Cheryl was standing with Tasha. Tasha and Roshonda began fighting. Sanders

2

intervened in the fight by hitting Tasha with a bottle. When Sanders intervened, Cheryl grabbed Sanders by her hair and pulled her away. After this second fight was broken up, Ms. Newman did not see Sanders again.

After the fight, Cheryl and Tasha were dancing in the middle of the road, and Ms. Newman was with them. Within five to ten minutes of dancing, someone yelled "she shooting," and Ms. Newman and Cheryl ran beside a vehicle parked at the Blackberry. Ms. Newman did not recall Tasha running in the same direction as them. While Ms. Newman, Cheryl, and others were hiding beside the car, Alvin Lewis ("Alvin") came out of the Blackberry and began shooting from behind the same car. Ms. Newman stated that Alvin was not looking where he was shooting. She did not see any other shooters, although she heard a lot of gunfire. Ms. Newman saw Cheryl fall after Cheryl stated she was hit. On cross-examination, Ms. Newman stated that Cheryl did not fall until after Alvin came out of the club and began shooting.

Tiffany Gibson testified that she witnessed the fight between Tasha and Roshonda. Ms. Gibson's testimony regarding the fight aligned with Ms. Newman's testimony, but their testimonies differed when recalling the events after the fight. Ms. Gibson stated that while they were dancing in the road, she saw Sanders walk toward them shooting what looked and sounded like a black 9 mm handgun. Ms. Gibson testified that she, Cheryl, and Tasha all ran together. As they were running, Cheryl yelled, "Tiff, I'm hit, and it's hot" before falling to the ground. Ms. Gibson stated that Cheryl was shot from behind, from the direction of the road, and fell forward. On cross-examination, Ms. Gibson stated that she did not hear any other gunshots, only the shots from Sanders.

3

Antranika Shelton testified that she was at the Blackberry the night of the shooting, and Cheryl was her cousin. She stated that inside the Blackberry, Wingate bumped into one of Sanders' relatives, which sent them into a verbal altercation that ended when she (the relative) threw a drink at Wingate. Roshonda, Sanders, Roosevelt, and the relative began fighting with Wingate. The fight ended at the entrance of the Blackberry.

Ms. Shelton stated that once Tasha found out about the fight with her boyfriend, another altercation ensued with the Sanders family. She stated that about twenty minutes later, Tasha saw Roshonda walking down the street and wanted to fight her one-on-one. During the one-on-one fight, Tasha was getting the best of Roshonda, so Sanders stepped in and hit Tasha with a beer bottle. Then, Cheryl hit Sanders and grabbed her by the hair. Sanders' brothers broke up the fights, and the Sanders family walked in the direction of Uncle Darrell's.

Ms. Shelton stated that when she looked toward the store, she saw Sanders aiming a weapon at Cheryl and Tasha, but she was not certain if Sanders or someone else fired shots first. Ms. Shelton ducked behind her vehicle and stayed there until the shots ceased. After the gunfire ceased, she heard people yelling that Cheryl was shot.

Wingate testified that while at the Blackberry, Sanders threw a cup of alcohol at him. She told him it was an accident, and he wanted her to apologize. When she did not apologize, one of Sanders' brothers hit Wingate in the eye, and other members of the Sanders family jumped into the fight. He stated that Tasha was with him and began screaming at them to stop, but they jumped on her as well. The fight ended when Tasha sprayed mace.

4

Wingate testified that he knew Tasha and Roshonda fought, but he did not walk over to the fight; he stayed by his truck. He stated that he saw Sanders' brother talking to his (Wingate's) father at the convenience store before handing Sanders a gun. Sanders began walking in the direction of the Blackberry and fired shots. Wingate stated that he fired shots in Sanders' direction and heard a third shooter.

Michelle Jackson testified that she is the DNA Supervisor for the North Louisiana Crime Lab. Ms. Jackson was accepted as a forensic expert. She stated that she was provided with a DNA sample for testing regarding the shooting outside the Blackberry. Ms. Jackson's report was submitted as evidence. The blood sample Ms. Jackson tested was consistent with Cheryl's DNA.

Dr. Christopher Tape was accepted as an expert in forensic pathology and performed the autopsy of Cheryl. He testified that he found a bullet at the bottom of Cheryl's right rib cage. He stated that the bullet entered right above Cheryl's left posterior hip. He testified that nothing would have prevented Cheryl from continuing to move forward after she was shot. Dr. Tape stated the trajectory of the bullet could be consistent with someone who was bent over and shot from behind.

Kendall Stracener testified that at the time of the shooting, he worked for the North Louisiana Crime Lab as Director and a firearms examiner. He was accepted as an expert in the field of firearms examination. He examined ten 9 mm cartridge cases from the scene and determined that six were fired from one weapon and four were fired from another weapon. Mr. Stracener testified that he examined the bullet recovered in the autopsy and determined it was a 9 mm.

Roosevelt testified that he is Sanders' older brother. Roosevelt stated that on the night of the shooting, his sister spilled a drink on Wingate's shirt, Wingate was upset, and Wingate called his sister names. He stated that he offered to buy Wingate a new shirt and asked him to stop disrespecting his sister, but Wingate continued the name-calling. Roosevelt testified that he and Wingate got into an altercation, and then his sisters and Tasha joined the fight; the fight ended when Tasha sprayed his sister with mace.

Roosevelt stated that after the fight ended, he went to the hospital to check on his sister, who was sprayed with mace, and he attempted to locate all his family members because gun threats were made by the other side after the fight. When he returned to the Blackberry, he saw Sanders standing across the street at Uncle Darrell's. Roosevelt could not recall where Sanders got a gun or who started shooting first. He testified that he tried to get the gun from Sanders but was unsuccessful and took cover. Roosevelt stated that he left the scene when the gunshots ceased.

Albert Paxton testified that he previously worked for the Louisiana State Police and assisted in taking statements after the shooting. Trooper Paxton stated that he interviewed Sanders, and Sanders stated that she was shooting that night.

Tyrone Taylor testified that he is Wingate's father. He stated that he arrived at Uncle Darrell's Convenience store after being informed that his son was in a fight. He approached Roosevelt to discuss the fight with his son, and Roosevelt flashed a gun from under his shirt. He stated that while they were talking, Sanders ran up and asked Roosevelt for the gun; Roosevelt told her she did not need the gun, they scuffled over the gun before Sanders got it, and she said, "I'm fixing to kill me a mother." Then

6

Sanders began shooting toward the Blackberry. After the shooting, Mr. Taylor saw Sanders leave with her little brother, Ra-Ra. Mr. Taylor testified that he was told his son had a gun at the scene, so he took it because he did not want his son to get in any trouble.

Tasha testified that Roshonda dumped a drink on Wingate as soon as they arrived at the Blackberry. Roshonda and Wingate exchanged words, Roosevelt intervened, and Roosevelt punched Wingate. Tasha stated that while pleading for someone to help Wingate, Roshonda, Sanders, and another girl attacked her. While the three ladies attacked her, Tasha pulled out mace and sprayed them. After the altercation, they all went their separate ways. Tasha stated that after about thirty minutes, Roshonda and Sanders came walking from across the street; Roshonda had a bat and Sanders had a bottle. Tasha stated that the Sanders sisters approached her and her sister in a "rage." The Sanders sisters wanted to fight, and Tasha agreed to fight one-on-one.

Tasha stated that during her one-on-one fight with Roshonda, Sanders hit her on the back of the head with a bottle. At that point, Cheryl grabbed Sanders and pulled her away. Tasha testified that when she and Roshonda were pulled apart, Roshonda stated that Tasha won the fight and walked toward a vehicle in the Blackberry parking lot; Sanders ran to Uncle Darrell's. After the fight, Tasha and Cheryl were dancing in the street. About fifteen minutes after the fight, while Tasha and Cheryl were still dancing in the street, Tasha saw Sanders approaching them with a gun; Sanders pointed the gun at them and fired multiple shots. Tasha testified that she grabbed Cheryl and told her to run. Tasha was shot in the right leg,

which was the leg facing Sanders, and Cheryl was shot in the left hip, which was also facing Sanders.

Tasha testified they did not realize Cheryl was shot until after they ran behind a vehicle, and she fell. Her cousin, Alvin, began shooting after Cheryl was shot, and Wingate was the third person to shoot. The State rested at the conclusion of Tasha's testimony.

The Defense called Derrick Sanders ("Derrick"), Sanders' brother, to testify. Derrick stated that he was at the Blackberry the night of the shooting to celebrate his nephew's homegoing. Derrick was not involved in the altercation but later learned about it. As he was leaving the Blackberry, Derrick saw Wingate holding a gun.

The Defense called Roosevelt to testify again. He stated that Sanders was the only one he saw shooting, but he heard other gunshots. Roosevelt testified that he saw Wingate with a gun before Sanders started shooting. On cross-examination, the State questioned why Roosevelt did not state earlier that he saw Wingate with a gun. He responded that he could not remember everything he said, and the event happened four years ago so it takes time to remember. The Defense rested after Roosevelt's testimony.

After closing arguments, the trial court found Sanders guilty as charged of the second degree murder of Cheryl. The trial court detailed the evidence that led to its decision, including a finding that Sanders had sufficient time for her blood to cool. The trial court ordered a presentence investigation report.

Sanders filed a motion for new trial and asserted that Alvin Lewis was not properly investigated, and new evidence suggests that his gunfire struck Cheryl. On June 21, 2023, a hearing was held on Sanders' motion. The trial

8

court denied the motion on the basis that Ms. Newman's testimony regarding Alvin's shots was not new evidence. After denying the motion, the trial court immediately proceeded with sentencing Sanders to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Sanders now appeals.

## DISCUSSION

Sanders' sole assignment of error is that there was insufficient evidence to prove she was guilty beyond a reasonable doubt of killing Cheryl. She highlights the following facts: Cheryl was killed by a gunshot fired from behind her; Sanders was in front of Cheryl; and Cheryl's cousin, Alvin, was firing a 9 mm handgun from behind or beside Cheryl when she was struck. She argues that because it is impossible to determine who shot Cheryl, the State's evidence failed to prove beyond a reasonable doubt that she is guilty of killing Cheryl. She requests that this Court reverse her conviction, vacate her sentence, and enter a judgment of acquittal.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L.Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. This standard, now codified in La. C. Cr. P. art. 821, does not afford appellate courts with a means to substitute its own appreciation of the evidence for that of the fact finder. *Steines, supra.*

9

The Jackson standard is applicable to cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983).

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *Broome, supra*; *State v. Gipson*, 45,121 (La. App. 2 Cir. 4/14/10), 34 So. 3d 1090, *writ denied*, 10-1019 (La. 11/24/10), 50 So. 3d 827.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court affords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 6/27/03), 847 So. 2d 1255.

10

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 153 So. 3d 438; *State v. Wiltcher*, 41,981 (La. App. 2 Cir. 5/9/07), 956 So. 2d 769.

Sanders was convicted of second degree murder in violation of La. R.S. 14:30.1. Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).

In this case, the trial court heard conflicting testimony regarding where Cheryl was positioned when she was shot. Ms. Newman stated Cheryl was beside the vehicle when she was shot, which was after Alvin began shooting from behind the vehicle. Ms. Gibson testified that she and Tasha were with Cheryl when she was shot. Ms. Gibson stated that Sanders walked toward them and fired shots, they ran together, and Cheryl was hit from behind. Tasha testified that Sanders aimed and shot toward her and Cheryl, she told Cheryl to run, and they were both hit from the direction Sanders was shooting. Tasha testified that Cheryl did not realize she was shot until after she hid behind a vehicle.

Based on this testimony, and that of the other witnesses at trial, we find that any rational trier of fact could have found the essential elements of second degree murder proven beyond a reasonable doubt. All three ladies testified that they saw Sanders point the gun toward Cheryl and shoot at her. Ms. Gibson and Tasha both stated they were with Cheryl when she was shot from behind. Tasha stated that Cheryl did not realize she was shot until after

11

she hid behind the vehicle and fell. Ms. Newman also recalled Cheryl falling behind the vehicle, but she did not recall Tasha running with them. Although Ms. Newman recalled Cheryl getting shot after Alvin came out of the Blackberry shooting, Tasha and Cheryl testified that she was shot from behind while running away. Tasha was also shot in the leg that was facing Sanders while she was shooting.

The trial court weighed the eyewitnesses' testimony and rejected the portion of Ms. Newman's testimony that Cheryl was shot after hiding behind the vehicle. The trial court accepted the timeline of Ms. Gibson and Tasha that Cheryl was shot while running away from Sanders. We will not disturb the trial court's witness credibility determination. Ms. Gibson's and Tasha's testimonies also align with Dr. Tape's testimony that the bullet entered above Cheryl's left posterior hip, which could be consistent with someone who was bent over and shot from behind.

Based on the evidence presented at trial, a rational trier of fact could have found that Sanders acted with a specific intent to kill or inflict great bodily harm in firing her gun toward Cheryl and Tasha. We affirm the trial court's finding that Sanders is guilty of the second degree murder of Cheryl.

**ERROR PATENT**

Our review of this record reveals that the trial court did not comply with the obligatory delay before sentencing Sanders. La. C. Cr. P. art. 873 provides, "If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." Sanders was sentenced immediately after her motion for a new trial was denied. Nevertheless, we

12

conclude that any error was harmless in this instance because Sanders did not object to the trial court's failure to observe the sentencing delay, and she suffered no prejudice as she faced a mandatory sentence of life imprisonment.

## CONCLUSION

For the foregoing reasons, Sanders' conviction and sentence are affirmed.

**AFFIRMED.**